In the

# United States Court of Appeals
### For the Seventh Circuit

No. 14-2046

NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC, *et al.*,

*Plaintiffs-Appellees*,

*v.*

FREEBORN & PETERS, LLP,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 1277 — **Harry D. Leinenweber**, *Judge*.

ARGUED SEPTEMBER 23, 2014 — DECIDED DECEMBER 5, 2014

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs in this diversity suit for legal malpractice are a limited liability company that we'll call for the sake of brevity Nelson Brothers and the two brothers (Brian and Patrick Nelson) who are the sole members (owners) of the company; we'll call them the Nelsons. The defendant, Freeborn & Peters, is a well-known Chicago law firm which the suit accuses of malpractice consisting of

eight breaches of the duty of loyalty that they owed the plaintiffs, their clients. More than $1.3 million in damages was sought. The case was tried to a jury, which returned a verdict that after being modified by the district judge awarded $786,880.85 to Nelson Brothers and $249,957.33 jointly to the two Nelsons—a total of slightly more than $1 million. The jury had calculated the total losses of Nelson Brothers and the Nelsons personally at $1,731,311.00, but had reduced the amount to $1,508,231.58 on the ground that the plaintiffs had been negligent and their negligence had contributed to their losses. The judge thus reduced the amount of damages further.

The malpractice claim arises from a transaction that the law firm handled for the plaintiffs involving real estate in Algonquin, Illinois, a suburb of Chicago. In 2008 Ben Reinberg and Burt Follman had hired Freeborn & Peters to handle their acquisition of a shopping center under construction in Algonquin, to be called the Algonquin Galleria. Edward J. Hannon was the Freeborn & Peters partner whom they dealt with. Reinberg's and Follman's company, Alliance Equities, contracted to buy the shopping center, but the deal had not yet closed. To help finance the acquisition Alliance Equities planned to sell ownership interests in the property to investors seeking tax advantages. These investors would be tenants in common of the shopping center. The parties call them the "TIC" investors.

Needing a partner, Alliance Equities was referred to Nelson Brothers and the two firms formed a joint venture, Alliance NW, half owned by each firm, to close the deal for the shopping center and complete its construction. The price was $22.5 million, and to help pay it Alliance NW obtained a

$16 million mortgage loan from a bank, and hired Freeborn & Peters, in the person of Hannon, to provide the legal services needed for the project. Representing as he did a joint venture of Alliance Equities and Nelson Brothers, Hannon was obligated to be loyal to both. The plaintiffs argue that he breached his duty to them in a variety of respects, for example by favoring Alliance Equities, his original client, over Nelson Brothers.

The agreement establishing the joint venture appointed three persons to manage the venture: Reinberg, Follman, and one of the Nelsons (Patrick), rather than all four of the principals (Reinberg, Follman, and both Nelsons). Expenditures of up to $50,000 could be authorized by a majority of the managers, thus giving Alliance Equities control of such expenditures. Larger expenditures required the agreement of the joint venture's members, Alliance Equities and Nelson Brothers. Patrick Nelson testified that Hannon did not inform him that the Nelsons could be outvoted with regard to expenditure decisions by the managers within the $50,000 limit.

The agreement made Nelson Brothers responsible both for obtaining the money needed to close the deal to buy the shopping center and for selling ownership interests to TIC investors. The amount of money needed for the closing was the difference between the $22.5 million purchase price and the sum of the $16 million mortgage loan and money received from the sale of ownership interests. Nelson Brothers agreed that it would obtain a loan in the amount required to close the gap and that the loan would be without recourse to Alliance Equities, meaning that Alliance Equities would not

be liable should the joint venture fail to repay the loan—only Nelson Brothers would be.

Nelson Brothers obtained a gap loan (a "mezzanine" loan, as it is called in the trade) of $5.175 million, but this was short by more than a million dollars of closing the gap between the mortgage loan and the purchase price. So Nelson Brothers obtained a second gap loan, again without recourse to Alliance Equities—so again only Nelson Brothers would be liable to the lender should there be a default.

There were mechanics' liens on the shopping center as a result of costs incurred during its construction. At least some of those liens, however, were insured against by title insurance policies. The bank that had made the $16 million mortgage loan was comfortable with the mechanics' liens; although they were prior debts, the bank considered its loan protected by its title insurance; should enforcement of the mechanics' liens result in losses of property that was collateral for the loan, the title insurer would cover the loss. See Noel C. Paul & Andrea Yassemedis, "Title Insurance Coverage for Mechanics Liens: A Lender's Guide," Oct. 31, 2012, http://apps.americanbar.org/litigation/committees/insurance/articles/septoct2012-mechanics-liens.html (visited Dec. 2, 2014). The gap lender was similarly protected. But some of the potential TIC investors became spooked when they learned there were mechanics' liens on the property, fearing that as part owners they might have to repay part of the liens or lose their ownership interests to foreclosure. As a result there was a delay in closing some $3 to $4 million in TIC sales, and some of the sales were cancelled altogether.

The Nelsons were alarmed. They needed the money from those sales to close the deal to buy the shopping center. They

decided to retain new lawyers rather than rely on Freeborn & Peters, which they were beginning to distrust, to help them solve the problem. The fees they paid their new lawyers are part of the damages they seek to recover in this lawsuit. The Nelsons contend that Hannon had failed to advise them that there were mechanics' liens on the property, or to create an escrow fund to enable the liens to be removed so that they wouldn't prevent sales to the TIC investors from closing.

Freeborn & Peters ripostes that the sale of the shopping center to the joint venture closed only two weeks before the financial collapse of September 2008, which drove down real estate values, and that as a result it became difficult to attract TIC investors. But apportioning the losses to the plaintiffs between inadequate representation by Freeborn & Peters and a sudden scarcity of potential TIC investors attributable to the financial collapse was a task for the jury. The law firm also argues that the plaintiffs' claim of damages caused by Hannon's failure to advise them of the mechanics' liens is barred by the statute of limitations, but they waived this argument in the district court by not making it until after the jury's verdict, which was too late. See Fed. R. Civ. P. 50, Committee Notes on Rules—2006 Amendment; *United States EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1286–87 (7th Cir. 1995); *United States for Use of Wallace v. Flintco Inc.*, 143 F.3d 955, 960–61 (5th Cir. 1998).

The plaintiffs' loss was the difference between their expenditures in trying to obtain a substantial interest in the shopping center and what they obtained for those expenditures—namely, that interest. If that interest were worth anything, awarding the plaintiffs as damages *all* their expendi-

tures would overcompensate them. But their contention, which the jury appears to have accepted, is that the interest they acquired was worthless because without the money of the potential TIC investors who were scared off by the mechanics' liens Nelson Brothers could not repay the loans that had been used to buy the property, which it alone was obligated to repay. An alternative possibility is that the project failed simply because of the financial crisis, which as we said hit real estate hard. But the jury didn't buy that theory.

A dispute arose between Alliance Equities and Nelson Brothers over fees owed Freeborn & Peters. (No surprise there.) Alliance Equities wanted to use proceeds from a sale of TIC interests to pay down those fees. Nelson Brothers disagreed. But exercising their right to authorize expenditures by the joint venture of less than $50,000, Reinberg and Follman, over the opposition of the third manager, Patrick Nelson, voted to pay $49,999 of the TIC proceeds to Freeborn & Peters. This transaction infuriated the gap lender, who, according to Patrick, threatened to declare Alliance NW in default for failing to remit the TIC proceeds to it. This contretemps occurred on the eve of the expiration of the six-month term of the gap loan. The joint venture wanted an extension; the lender granted a three-month extension but at a price twice as high as contemplated in the loan agreement. The plaintiffs blame Hannon for failing to prevent the $49,999 expenditure that by violating the terms of the gap loan agreement precipitated the imposition of stiff terms for the extension.

Still another concern of the Nelsons about the gap loan was that the loan agreement imposed what are called "bad boy" guarantees on them. As a result, not only was the loan

nonrecourse against Alliance Equities but the Nelsons individually were guarantors. They contend that they had to hire another law firm to advise them of the breadth of the guarantees, which they say Hannon hadn't explained to them.

Freeborn & Peters denied in the district court that they had been retained to represent either Nelson Brothers or the Nelsons with regard to the terms of the gap loan. But on appeal they have switched grounds and contend that because the Nelsons were never required to make good on the guarantees, they incurred no loss that can be attributed to the law firm. The contention overlooks the fact that the fees the Nelsons paid their new lawyers were a reasonable measure to head off the harm that could have resulted from Freeborn & Peters's failure to advise the plaintiffs of the risks associated with the guarantees. The fees mitigated the consequences of that failure—a failure the plaintiffs deem negligent.

Eventually, with the gap loan partially repaid yet more than $4.3 million of principal still owing on it, the joint venture sought and was refused a further extension of the loan. Shortly afterward the lender declared a default, requiring Nelson Brothers to repay the loan.

Hannon admits that he never discussed with the Nelsons the potential conflicts of interest between them and Alliance Equities or the possibility that the Nelsons should retain separate counsel to advise them.

Of the $1,731,311 in damages sought by the plaintiffs, $259,069 were for the lawyers' fees they incurred (other than to Freeborn & Peters) to resolve the mechanics' liens problem and to assess the risks associated with the Nelsons' per-

sonal guarantees of the extended gap loan. The balance of the damages sought consisted of money that the Nelsons had had to repay to another gap lender and to relatives from whom they had borrowed and of earnest money to secure membership in the joint venture. They claim that they would not have borrowed any of this money or entered into the joint venture in the first place had Hannon advised them of the risks they were taking—the risks created for example by the bad-boy guarantees, Alliance Equities' control of expenditures under $50,000 (which led to the expenditure that caused such trouble with the original gap lender), and the absence of an escrow fund to pay off mechanics' liens. Implicit in treating the repayments of loans as losses is that the money borrowed produced no profits for Nelson Brothers or net income for the Nelsons personally. For the acquisition of the shopping center turned out to be a flop, causing substantial losses to both the Nelsons and their company as a result of their having to repay substantial loans from which they derived no benefit.

Freeborn & Peters argued at trial that it didn't represent the plaintiffs at all, but that is wrong. It represented both parties to the joint venture, Alliance Equities and Nelson Brothers, and Nelson Brothers and the Nelsons are interchangeable. A reasonable jury could find that the law firm violated its ethical obligations to the plaintiffs by not warning them of the firm's conflicts of interest, by drafting agreements that reflected favoritism toward Alliance Equities and concealing the favoritism from the plaintiffs (as by not revealing that Alliance Equities would be controlling the below-$50,000 expenditures—which later resulted in the decision to pay the law firm $49,999 owed to the gap lender), and by failing to advise the plaintiffs of the risks to them

created by the bad-boy guarantees and the mechanics' liens on the shopping center, and finally by closing the deal for the shopping center without providing for an escrow to cover the liens.

Freeborn & Peters argues that it isn't liable for any problems with the mechanics' liens because it was unforeseeable that the mortgage lender would be worried by them. The argument ignores the fact that the TIC investors may have been scared off investing by fear that they might have to pay off the liens as part owners of the shopping center. An expert witness for the plaintiffs testified that title insurance would not have assuaged the investors' fears as well as an escrow fund would have done because the title insurer might find reasons not to indemnify the insureds.

The law firm argues that at least it has no liability to the Nelsons as distinct from their company because they were not a client but merely the client's owners. Corporate shareholders (or their equivalent, members of an LLC) can't seek personal damages for an injury to their corporation, since if the corporation obtains damages the shareholders will be compensated indirectly—their shares will be worth more. But the law firm created individual liabilities for the Nelsons—their personal guarantees of the gap loan and their obligations to repay the relatives from whom they borrowed money to enable repayment of that loan.

The jury's determination of liability is thus unassailable. But its damages award, even as corrected by the district judge, was irregular and presents the most difficult issue in this appeal.

The plaintiffs made the following expenditures that they claim they would not have made had it not been for Freeborn & Peters' malpractice: *Expenditures by Nelson Brothers*: $1,283,373.11 as an equity contribution to Alliance NW; $141,000 in earnest money to secure membership in Alliance NW; $120,000 paid in attorneys' fees for legal defense costs necessitated by the default on one of the gap loans; $55,714.82 in attorneys' fees for advice on clarifying the scope of the guarantees; $83,354 in attorneys' fees for clarifying potential obligations stemming from the mechanics' liens. *Expenditures by the brothers rather than by their company*: $47,869 repaid by the Nelsons to relatives from whom they'd borrowed $161,000.

The plaintiffs' total losses were thus $1,283,373.11 + $141,000 + $120,000 + $55,714.82 + $83,354 + $47,869 = $1,731,310.93. The jury assessed Nelson Brothers' damages at $865,655.50 and the brothers' damages at $865,655.50. (The sum of the two amounts is 7 cents more than the above total, a difference that can be disregarded.) But the jury also found contributory negligence by Nelson Brothers and the two brothers and reduced the award to Nelson Brothers to $865,655.50 x (1 − 9.1%) = $786,880.85 and the award to the two brothers to $865,655.50 x (1 − 16.67%) = $721,350.73.

The district judge further reduced the brothers' award—to $249,957.33. He got there by finding, first, that the Nelsons, not their company, had paid the $55,714.82 in attorneys' fees incurred to clarify the guarantees and the $83,354

in fees to try to resolve the effect of the mechanics' liens. To these amounts he added $161,000—the principal of the loan the Nelsons had obtained from their relatives, rather than $47,869, the amount they had repaid. These additions brought the total up to $300,068.82, which the judge then reduced by the percentage the jury had attributed to the brothers' contributory negligence. The result, after the judge rounded the jury's 16.67% calculation to 16.7% and applied the deduction to his gross estimate of $300,068.62, was $249,957.33, and the Nelsons accepted that amount.

Both jury and judge made mistakes. The jury split the damages 50-50 between Nelson Brothers the company and the brothers themselves, even though the Nelsons' only loss to date is the $47,869 they repaid for the loan they received from their relatives. The losses could be greater should the Nelson brothers ever have to pay back the balance of the $161,000 loan from their relatives, but the parties have not addressed that question.

The judge incorrectly found that the Nelsons had paid the $55,714.82 in attorneys' fees incurred to clarify the guarantees and the $83,354 in attorneys' fees incurred to clarify the mechanics' liens. In fact, Patrick Nelson testified that Nelson Brothers LLC had paid both of those sums, and Freeborn & Peters doesn't contest that. And remember that the judge deemed $161,000 (the principal of the loan from the relatives), rather than $47,869 (what the brothers repaid) as the brothers' loss from having to obtain the loan—without determining whether they would ever be asked to repay it.

Nelson Brothers was entitled by way of damages to all of its expenditures, after the discount for its contributory negligence: $1,530,248.71 [($1,283,373.11 + $141,000 + $120,000 +

$55,714.82 + $83,354) x (1 − .091)]. The Nelsons were entitled to their expenditures (net of their contributory-negligence offset), but their only expenditure was the partial repayment of the loan to them by their relatives, $47,869, which after the jury's adjustment for their contributory negligence adjustment was only $39,889.24. Yet the judge decided that Nelson Brothers should be awarded $786,880.85 and the brothers $249,957.33. This overcompensates the brothers—awarded $249,957.33 though entitled to only $39,889.24—and undercompensates Nelson Brothers, awarded only $786,880.85 but entitled to $1,530,248.71. Nevertheless, because the plaintiffs as a whole were awarded only $1,036,838.18, which is much less than the $1,530,248.71 to which they're entitled, yet they aren't asking for more, and because, the brothers and their company appear to be interchangeable, the errors made by jury and judge seem harmless. Cf. *Fisher v. Agios Nicolaos V*, 628 F.2d 308, 318–21 (5th Cir. 1980); *International Paper Co. v. Busby*, 182 F.2d 790, 792–93 (5th Cir. 1950). In any case, the errors don't harm the defendant, which can't (so far as we know) care whether it writes a check to the Nelsons or to their LLC. Nor is there any evidence that any creditors of Nelson Brothers will be harmed by this division of damages between the company and its owners. Nor are the plaintiffs complaining about the damages they've been awarded.

AFFIRMED.